**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES BARNARD; RITA
BARNARD,
  *Plaintiffs-Appellees*,

v.

GREG THEOBALD, #6527; GARY
CLARK, #6240; STEVEN
RADMANOVICH, # 6420, individually
and as Police Officers employed by
the Las Vegas Metropolitan Police
Department,
  *Defendants-Appellants*,

and

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, A political
subdivision of the State of Nevada,
  *Defendant*.

No. 11-16625

D.C. No.
2:03-cv-01524-
RCJ-LRL

CHARLES BARNARD; RITA
BARNARD,

*Plaintiffs-Appellants*,

v.

GREG THEOBALD, #6527; GARY
CLARK, #6240; STEVEN
RADMANOVICH, #6420, individually
and as Police Officers employed by
the Las Vegas Metropolitan Police
Department,

*Defendants-Appellees*,

and

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, A political
subdivision of the State of Nevada,

*Defendant*.

No. 11-16655

D.C. No.
2:03-cv-01524-
RCJ-LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
February 15, 2013—San Francisco, California

Filed July 1, 2013

Before: Michael Daly Hawkins and Milan D. Smith, Jr., Circuit Judges, and James G. Carr, Senior District Judge.[*]

Opinion by Judge James G. Carr

---

## SUMMARY[**]

---

### Civil Rights

The panel affirmed the district court's entry of judgment on a jury verdict in an action alleging that police officers used excessive force, but vacated the district court's decision reducing the attorneys' fee award and denying plaintiffs pre- and post-judgment interest.

The panel held that the district court properly denied the officers' motions for judgment as a matter of law because the jury verdict was supported by substantial evidence, and the officers were not entitled to qualified immunity. The panel noted that the jury had found, by special interrogatory, that the officers used an unreasonable amount of force and the officers failed to meet the relevant burden necessary to overturn the finding.

The panel held that the district court abused its discretion where it reduced the amount of the fees award without

---

[*] The Honorable James G. Carr, Senior District Judge for the U.S. District Court for the Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

explaining why a 40 percent reduction would be an appropriate remedy. The panel further held that the district court abused its discretion by denying post-judgment interest because such an award is mandatory, and that the court's stated reasons for denying prejudgment interest appeared to be questionable. The panel vacated those aspects of the district court's orders and remanded for further proceedings.

## COUNSEL

Walter R. Cannon, Peter M. Angulo, and Thomas D. Dillard, Jr. (argued), Olson, Cannon, Gormley & Desruisseaux, Las Vegas, Nevada, for Defendants-Appellants–Cross-Appellees.

Paola M. Armeni (argued) and Margaret W. Lambrose, Gordon Silver, Las Vegas, Nevada, for Plaintiffs-Appellees–Cross-Appellants.

## OPINION

CARR, Senior District Judge:

Charles Barnard (Charles) brought suit against Las Vegas Metropolitan Police Officers Greg Theobald, Gary Clark, and Steven Radmanovich (collectively, the Officers) for their alleged use of excessive force in violation of the Fourth Amendment. A jury found that the Officers' use of force was constitutionally excessive, and awarded Charles over $2 million in compensatory damages. In post-trial motions, the Officers argued that the jury verdict could not stand because they are entitled to qualified immunity. The Officers also argued they are entitled to a new trial because of a plethora of

perceived prejudicial errors committed by the trial court.[1] The district court denied the Officers' motions. Because the Officers are not entitled to qualified immunity, we affirm the district court's entry of judgment on the jury's verdict. However, we agree with Charles's arguments—raised in his cross-appeal—that the district court abused its discretion by failing to adequately explain its decision to reduce the amount of attorney fees awarded to Charles, and in denying Charles pre-and post-judgment interest. Consequently, we reverse those portions of the district court's decision, and remand for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND[2]

Around 11:30 p.m. on December 8, 2001, the Officers arrived at the home of Charles and Rita Barnard (Rita) to execute an arrest warrant. The warrant called for the arrest of David Barnard (David), Charles's brother, who was staying with Charles and Rita.

Upon arrival at the Barnard residence, the Officers knocked on the door, announced themselves as police officers, and demanded entry. Charles opened the door and came out on the landing. The Officers immediately confronted him. All of the Officers had their weapons drawn, and Officer Clark had his weapon pointed at Charles. At

---

[1] We resolve—and reject—the Officers' trial error claims in the memorandum disposition filed concurrently with this opinion.

[2] Given the jury verdict for Charles, we present the facts "in a light most favorable to him, resolving conflicts in his favor and giving him the benefit of reasonable inferences." *Murphy v. F.D.I.C.*, 38 F.3d 1490, 1495 (9th Cir. 1994).

trial, Charles testified that the Officers appeared agitated, and that they were "shaking, they're screaming, yelling at me, 'Hey, motherfucker, put your hands up, put your fucking hands up.'" Charles put up his hands.

The Officers asked Charles to identify himself. Charles told the Officers that his driver's license was in his bedroom, and asked the Officers to explain the purpose of their visit. The Officers explained that they had a warrant to arrest David. Charles told the Officers that David is his brother, and that he was asleep inside the house. The Officers ordered Charles to turn around and put his "fucking hands on the wall." Again, Charles complied.

Standing behind Charles, Officer Theobald seized Charles's right arm and handcuffed his right wrist. Before Theobald could handcuff Charles's other arm, however, Theobald tripped on a flower pot that was on the Barnards' landing. Theobald fell backward, still holding onto the handcuffs that were attached to Charles's right wrist. Officer Radmanovich, who had been standing to Charles's left, grabbed for Charles's left (free) arm as Charles was being pulled down by Theobald, but Radmamovich tripped over one of Charles's legs, and all three men came crashing down; Radmanovich on top of Charles, and Charles on top of Theobald.

Officer Clark then joined the fracas. Clark came over to Charles, who was still lying on top of Theobald, and put Charles in a chokehold. Clark then tried to lift Charles up by his neck. Theobald, however, still had hold of the handcuff around Charles's right wrist. The other officers yelled at Theobald to release the cuff, which he did. Still holding Charles by the neck, Officer Clark then lifted Charles even

higher off the ground and spun Charles around so that he was on his hands and knees with Officer Clark straddling his back. Charles testified that at some point during this time, his "legs went numb."

Clark kept Charles in a chokehold as he rode Charles to the floor. While Clark was sitting on Charles's back restraining him in a chokehold, Officers Theobald and Radmanovich ordered Charles to give them his "motherfucking" arms. With Clark on top of him, however, Charles could not comply with the Officers' order. Officer Theobald then instructed Clark to use his chemical agent (*i.e.*, pepper spray) to gain Charles's compliance. While still sitting on Charles's back, Officer Clark released the chokehold and sprayed pepper spray into Charles's face. Clark then dropped his spray canister next to Charles. One of the Officers immediately picked up the can and pepper-sprayed Charles for a second time.

Soon thereafter, Officer Clark got off of Charles's back, and the other Officers handcuffed Charles's arms behind him. Both Officers Radmanovich and Theobald then dug one of their knees into Charles's back—Officer Radmanovich's knee pressed near Charles's neck and shoulders, and Officer Theobald's pressed into Charles's lower back.

At this point, Rita came to the front door to investigate the disturbance. Officer Clark ordered her to "put your fucking hands up, [and] get on the fucking wall." Clark then asked Rita to identify herself. Rita identified herself as Charles's wife.

Finally, David came to the front of the house. Officer Radmanovich got off of Charles in order to secure David.

Meanwhile, Officer Theobald slid his knee up Charles's back towards his neck. For the next few minutes, as Officers Clark and Radmanovich secured the scene, Theobald kept his knee pressed firmly into the back of Charles's neck and shoulders.[3] Charles repeatedly asked Theobald to get off of his neck, and told Theobald that he was in considerable pain. But Theobald refused to relent. Eventually, after the other Officers had secured David in the back of a police car, Theobald released his knee from the back of Charles's neck. Charles was taken to Clark County Detention Center, where he was held for three days on charges of battery on a police officer, resisting an officer, and obstructing a public officer.[4]

The same morning Charles was released from jail, he sought medical treatment at University Medical Center. Charles complained to the attending physician of severe pain in his hip, neck and shoulders. A week later, Charles returned to the same doctor because his pain had still not subsided. Charles was referred to a specialist, who further referred Charles to physical therapy. But physical therapy was not enough to alleviate Charles's pain and other symptoms. Ultimately, over the course of many years, Charles underwent nine spinal surgeries in an effort to relieve the various symptoms he claims were caused by his encounter with the

---

[3] The Officers struggled to secure the scene because David, an ex-police officer and United States Marine, apparently took umbrage at the Officers' aggressive tactics in restraining him and his brother.

[4] Charles was never convicted of any criminal offense related to the December 8 incident.

Officers.  As of the time of trial, Charles's symptoms had still not subsided.[5]

## PROCEDURAL BACKGROUND

Charles brought suit against the Las Vegas Metropolitan Police Department (LVMPD) and the Officers on December 5, 2003.  Charles alleged that the Officers arrested him without probable cause, and used excessive force in making his arrest.  Charles further alleged that the LVMPD was vicariously liable for the Officers' actions.

In March 2007, then-United States District Judge Brian Sandoval granted LVMPD's and the Officers' motions for summary judgment and entered judgment in favor of the defendants.  A panel of our court affirmed in part, reversed in part, and remanded. *See Barnard v. Las Vegas Metro. Police Dep't.*, 310 F. App'x 990, 994 (9th Cir. 2009).  Specifically, we affirmed the district court's grant of summary judgment to the Officers on Charles's false arrest claim after finding the Officers were entitled to qualified immunity. *Id.* at 992.  We also affirmed the district court's grant of summary judgment to the LVMPD on the basis that municipal liability in § 1983 actions cannot be based on vicarious liability.[6] *Id.* at 992–94.  However, we reversed the district court's grant of summary judgment to the Officers on Charles's excessive force claim. We explained that the Officers were not entitled to qualified immunity because, "construing the evidence in the light most favorable to the plaintiff" at "the time of the incident at issue

---

[5] "Q: Chuck, as you sit here today, can you tell us how you feel as far as painwise [sic]?  A: It kills me.  It's constant."

[6] *See generally Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013).

here, a reasonable officer would have known it violated clearly established law to use a choke hold on a non-resisting arrestee who had surrendered, pepper-spray him, and apply such knee pressure on his neck and back that it would cause the collapse of five vertebrae in his cervical spine." *Id.* at 993. We thus remanded Charles's excessive force claim for trial.

Trial began on January 24, 2011, and lasted seven days. At the conclusion of the plaintiff's case-in-chief, the Officers moved for a directed verdict under Federal Rule of Civil Procedure 50(a). The principal basis of the Officers' motion was that the amount of force used was "exceptionally reasonable under the circumstances," and, in any event, the Officers could have reasonably believed that Charles was resisting arrest.[7] The district court denied the Officers' motion in relevant part.

After the close of evidence and the receipt of jury instructions, the district judge submitted the following special interrogatories to the jury, and the jury returned the verdicts indicated in brackets:

> 1) Did Charles Barnard forcibly resist when the officer Defendants attempted to handcuff him on December 8, 2001? [No.];

---

[7] The Officers also moved for a direct verdict on the issue of punitive damages. The district court agreed with the Officers that there was insufficient evidence to show that the Officers acted with malice or deliberate indifference towards Charles's constitutional rights, and so granted the Officers' motion with respect to the (un)availability of punitive damages. Charles does not appeal that ruling.

2) If your answer to Question 1 above is "No," did the officer Defendants make a reasonable mistake of fact that he was forcibly resisting arrest? [Yes.];

3) Did the following Defendants violate Charles Barnard's Fourth Amendment rights by using excessive force in seizing him in his home on December 8, 2001? [Yes as to all defendants.]; and

4) What amount of damages did the defendants cause Charles Barnard to incur? [$2,111,656.52].

After the verdict, the Officers filed renewed motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Once more, the Officers argued that they were entitled to qualified immunity. The Officers also filed a Rule 50(b) motion attacking the evidentiary sufficiency of the jury verdict, and another motion—brought pursuant to Federal Rule of Civil Procedure 59(a)—alleging that trial errors warranted a new trial or, alternatively, remittitur. For his part, Charles filed a motion for attorney fees pursuant to 42 U.S.C. § 1988.

On June 7, 2011, the district court denied the Officers' motions for judgment as a matter of law. The district court did, however, agree with the Officers that Charles's pain and suffering award was excessive, and directed that such "damages should be reduced by $500,000 and that a just and reasonable amount of damages for pain and suffering should bring the verdict to $1,611,656.52." Charles accepted the remittitur.

The district court also granted in part Charles's motion for attorney fees. Charles had requested an award of $315,505 in attorney fees and $61,408.80 in costs. The district court granted Charles the full amount of his costs, but reduced the attorney fees award by 40 percent, to $189,303.

On August 8, 2011, the district court entered judgment in favor of Charles. The judgment included the remittitur sum of $1,611,656.52, and provided that prejudgment interest was to be paid at the rate of 3.25% and post-judgment interest at the rate of 4%. The Officers then filed a motion for reconsideration, arguing that the award of both pre-and post-judgment interest was improper. The district court agreed with the Officers regarding prejudgment interest. In one paragraph of analysis, the district court explained that prejudgment interest may not be appropriate when applied to an award of non-economic damages. The court also reasoned that prejudgment interest was inappropriate because it was unclear which portion of Charles's award, if any, was intended to compensate him for future pain and suffering. The implication of the district court's order is that prejudgment interest should be unavailable whenever a jury returns a general verdict that does not distinguish between past and future compensation. The district court's order did not address Charles's entitlement to post-judgment interest. Nevertheless, the district judge entered an amended judgment that provided for neither pre- or post-judgment interest. Both Charles and the Officers timely appealed.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's denial of a renewed motion for judgment as a matter of law. *Josephs v. Pac. Bell*, 443 F.3d

1050, 1062 (9th Cir. 2005). We must view the evidence in the light most favorable to the nonmoving party, here Charles, and draw all reasonable inferences in his favor. *Id.*; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–50 (2000). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs*, 443 F.3d at 1062.

We review the district court's decision to award attorney fees, and its method of calculation, for abuse of discretion. *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055, 1059 (9th Cir. 2006). Similarly, a district court's decision whether to award pre- or post-judgment interest is reviewed for abuse of discretion. *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1107 (9th Cir. 1998).

## DISCUSSION

## I. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). "[T]he Supreme Court set forth a two-part test for qualified immunity in excessive force cases. First, we examine whether a Fourth Amendment violation occurred; second, we look to see whether the officers violated clearly established law." *Cameron v. Craig*, 713 F.3d 1012, 1020 (9th Cir. 2013) (quoting *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002)).

The Officers advance two theories to explain why they are entitled to qualified immunity. First, they contend that their use of force was objectively reasonable as a matter of law, and thus no Fourth Amendment violation occurred. Second, the Officers argue that they are entitled to qualified immunity because the jury expressly found that the Officers made a "reasonable mistake of fact that [Charles] was forcibly resisting arrest." Neither theory is availing.

We have already rejected the Officers' first contention that their conduct was objectively reasonable as a matter of law. In reversing the district court's grant of summary judgment, we concluded "that the plaintiff tendered sufficient evidence to demonstrate a triable issue of fact on his excessive force claim against the individual officers." *Barnard*, 310 F. App'x. at 993. That is, we concluded that if the jury believed Charles, the evidence likely to be presented at trial could establish a constitutional violation because the Officers' conduct was not *per se* reasonable. We reject the Officers' invitation to revisit that decision.

Even more fundamentally, a jury has now expressly decided that the Officers' conduct was unreasonable in light of the actual evidence Charles presented at trial. We have held repeatedly that "[b]ecause questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Cameron*, 713 F.3d at 1021 (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994)). Here, the jury found—by special interrogatory—that all of the Officers in this case used an unreasonable amount of force against Charles.

The Officers ask us to overturn this finding, but do not even come close to meeting the relevant burden necessary for us to do so. We review a jury verdict to determine whether it is supported by substantial evidence, and we may overturn a jury's verdict in those rare cases where the evidence "permits only a conclusion contrary to [that] verdict." *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1008 (9th Cir. 2004). But as noted above, we already held at the summary judgment stage that Charles's evidence could sustain a jury verdict in his favor. *Barnard*, 310 F. App'x. at 993. Now that Charles has presented that very same evidence to the jury, and the jury has accepted it, we cannot properly hold that the evidence in the record "permits only a conclusion contrary to the jury's verdict." *McLean*, 222 F.3d at 1153.

The Officers' alternative argument fares no better. At bottom, the Officers claim that if Charles was actually resisting, or if the Officers could have reasonably believed that he was resisting, then the Officers are entitled to qualified immunity as a matter of law. Completing the Officers' syllogism, the Officers must be entitled to qualified immunity because the jury specifically found that "the officer Defendants [made] a reasonable mistake of fact that [Charles] was forcibly resisting arrest."

The Officers are simply mistaken in their understanding of the law. Resistance, or the reasonable perception of resistance, does not entitle police officers to use *any* amount of force to restrain a suspect. *See LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) ("[I]f the extent of the injury to [plaintiff's] back is serious enough, a jury could conclude that [the officer] used force in excess of what

was reasonable, even if [plaintiff] had been resisting at the time."); *see also Santos*, 287 F.3d at 853 ("[E]ven where some force is justified, the amount actually used may be excessive."). Rather, police officers who confront actual (or perceived) resistance are only permitted to use an amount of force that is *reasonable* to overcome that resistance.[8] Here, the jury concluded that the amount of force used by the Officers was unreasonable, even in light of their mistaken belief that Charles was resisting.[9]

## II. Attorney Fees

42 U.S.C. § 1988 "provides that in federal civil rights actions the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." *Hensley v. Eckerhart*, 461 U.S. 424, 426 (1983) (internal quotation marks and citation omitted). Congress passed § 1988 "to attract competent counsel to prosecute civil rights cases." *Mendez v. Cnty. of San Bernadino*, 540 F.3d 1109, 1126 (9th Cir. 2008) (citation omitted). Consequently, "a court's discretion to deny fees

---

[8] It is for this reason that Charles brought a claim for the Officers' "*excessive* use of force" as opposed to merely the Officers' "use of force."

[9] On appeal, the Officers have not challenged whether the right to be free from their unreasonable actions was clearly established, that is, whether the officers made a "reasonable mistake as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236. Because "[t]his court 'will not ordinarily consider arguments that are not specifically and distinctly raised and argued in appellant's opening brief," *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (quoting *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985)), we decline to consider such an argument here.

under § 1988 is very narrow and . . . fee awards should be the rule rather than the exception." *Id.* (quoting *Herrington v. Cnty. of Sonoma*, 883 F.2d 739, 743 (9th Cir. 1989)) (internal quotation marks omitted).

Charles submitted bills for $315,505 in attorney fees and $61,408.80 in costs. The district court awarded Charles the full amount of his costs, but reduced the attorney fees award by 40 percent, to $189,303. The court explained the basis for its reduction as follows:

> In calculating the lodestar, the Court will accept the rates proffered by movants but will not accept all hours as reasonable. The case was not particularly complicated, and discovery had closed when movants took the case. The litigation history of the case was neatly laid out for the parties in the electronic record. Movants had merely to review the record as it stood before trial, and apart from responding to a motion in limine, they needed only prepare for trial itself. Over 600 attorney hours and 200 paralegal/assistant hours in preparation for a single-claim excessive force trial after pretrial practice is complete is excessive. The trial itself took roughly fifty hours. The Court will therefore reduce the claimed hours by 40% in calculating the lodestar to be $189,303 and will not apply a multiplier.

"We have long held that district courts must show their work when calculating attorney's fees." *Padgett v. Loventhall*, 706 F.3d 1205, 1208 (9th Cir. 2013). Failure to

thoroughly explain the basis for an attorney fees award is problematic because without such an explanation, "it is simply not possible for this court to review such an award in a meaningful manner. Absent some indication of how the district court's discretion was exercised, this court has no way of knowing whether that discretion was abused." *Id.* (quoting *Chalmers v. City of L.A.*, 769 F.2d 1205, 1213 (9th Cir. 1986)).

Here, the district court found that the hours billed by Charles's attorneys were "excessive," and reduced the amount of the fees award by 40 percent. But while the district judge explained why he thought the award was excessive, he failed to explain why he thought that a 40 percent reduction would be an appropriate remedy. Furthermore, while the district court considered the amount of time it believed plaintiffs' attorneys should have spent on the case in light of the case's complexity, it is not clear whether the trial court adequately considered Charles's "degree of success," which the Supreme Court has explained is "the most critical factor" in determining an appropriate amount of attorney fees. *Hensley*, 461 U.S. at 436. Consequently, we must vacate the fees award and remand[10] for a more complete explanation.[11]

---

[10] On remand, we do not direct that the district court reach any particular result in awarding Charles's attorney fees. As we have explained, however, the district court must adequately specify its reasons for alighting on whatever figure it ultimately selects. *Padgett*, 706 F.3d at 1208–09. "It is worth repeating that since the district court is already doing the relevant calculation, it is a small matter to abide by the injunction of the arithmetic teacher: Show your work!" *Id.* at 1208 (internal quotation marks, citiation, and alterations omitted).

[11] All pending motions for judicial notice are denied as moot.

## III.    Judgment Interest

Although the district court initially entered a judgment that provided for both pre- and post-judgment interest, its amended judgment provides for no interest whatsoever. With respect to post-judgment interest, this was a clear abuse of the district court's discretion: Under 28 U.S.C. § 1961, the award of post-judgment interest on a district court judgment is mandatory. *See Air Separation Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 289–90 (9th Cir. 1995) (holding that post-judgment interest is mandatory, and noting that the"[f]ailure to award post[-]judgment interest would create an incentive for defendants to exploit the time value of money by frivolously appealing or otherwise delaying payment."). Consequently, we remand to the district court with instructions to award Charles appropriate post-judgment interest.

On remand, the district court may also wish to reconsider its decision to deny Charles prejudgment interest. For while the ultimate decision whether to award prejudgment interest lies "within the court's sound discretion, to be answered by balancing the equities," *Wessel v. Buhler*, 437 F.2d 279, 284 (9th Cir. 1971), the court's stated reasons for denying prejudgment interest in this case appear to be questionable.

First, the district court seemed to suggest that prejudgment interest is not appropriate when applied to an award of non-economic damages. This is incorrect. We have held that prejudgment interest is an element of compensation, not a penalty. *See Schneider v. Cnty. of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002) (explaining that prejudgment interest "serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is

entered, thereby achieving full compensation for the injury those damages are intended to redress."). Non-economic damages awarded for a plaintiff's pain and suffering are "just as much an 'actual loss' (for which prejudgment interest is in order)" as purely economic damages. *See Murphy v. City of Elko*, 976 F. Supp. 1359, 1364 (D. Nev. 1997). Thus, to the extent the district court denied prejudgment interest because it thought such interest is unavailable for non-economic damages, the district court abused its discretion.

Second, the district court refused to award prejudgment interest because the jury returned a general verdict that did not distinguish between past and future damages. Because the district court believed that interest should not be awarded with respect to future damages, the district court refused to grant interest on any portion of the award. On remand, the district court should consider the balance of the equities in making this determination, including whether it may be advisable to award prejudgment interest on a prorated portion of the award. For instance, the district judge may consider whether it is appropriate to award prejudgment interest for at least that portion of the award that was likely given to Charles in order to compensate him for his past pain and suffering and medical expenses.[12]

---

[12] The district court noted that the jury award of $2,111,656.52 was exactly the sum of two figures Charles's attorneys requested, $219,496.52 in past medical damages and $1,892,160 in pain and suffering damages. At a minimum, then, the district court could properly award prejudgment interest on the $219,496.52 requested (and presumably awarded) as medical damages. And the district judge would also have discretion to further prorate the damages award in order to provide interest on that portion of the award that was intended to compensate Charles for the pain and suffering he endured between the day of his injury and the day judgment was entered.

**CONCLUSION**

The district court properly denied the Officers' motions for judgment as a matter of law because the verdict is supported by substantial evidence, and the Officers are not entitled to qualified immunity. The district court abused its discretion, however, where it awarded attorney fees without adequately explaining the basis of its award, and where it denied Charles pre- and post-judgment interest. We thus vacate those two aspects of the district court's orders and remand for further proceedings consistent with this opinion.

Costs on appeal to plaintiff. Fed. R. App. P. 39(a)(4).

**AFFIRMED IN PART, REVERSED IN PART, VACATED, AND REMANDED.**